Berger Engineering Company v. Commissioner.
Berger Engineering Co. v. Commissioner
Docket No. 65321.
United States Tax Court
T.C. Memo 1961-292; 1961 Tax Ct. Memo LEXIS 57; 20 T.C.M. (CCH) 1518; T.C.M. (RIA) 61292; October 24, 1961
R. J. Cleary, Esq., Farmers Bank Bldg., Pittsburgh, Pa., and Albert A. Logan, Esq., for the petitioner. Leo A. Burgoyne, Esq., for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: The Commissioner determined a deficiency in income tax for the year 1953 in the amount of $65,209.41. The first question presented is whether petitioner reported its gross income *58 from a long-term contract so as to reflect clearly its net income from such contract for 1953. The second question to be decided is what is the amount of the net operating loss deduction, if any, to which petitioner is entitled for 1953. Findings of Fact Some of the facts have been stipulated and are incorporated herein by reference. Petitioner is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania, with its principal place of business in Pittsburgh. Petitioner filed its Federal income tax returns for the years 1953 to 1955 under an accrual method of accounting with the district director of internal revenue at Pittsburgh. John N. Berger was president and treasurer of petitioner from the time of its formation through 1955. The success of petitioner was directly attributable to Berger as those dealing with petitioner did so because of Berger's engineering knowledge, skill and ability. In 1953 petitioner entered into an agreement with Houdaille-Hershey Corporation, Macon Arms Division, for tools and other items of equipment to produce automatically 8-inch shell forgings. The total price under the agreement was $595,000. The tools and other *59 items of equipment to be furnished and the prices therefor, were as follows: Item of Equipment
Contract Price
Motor-operated Billet Rack
$ 21,000
Motor-driven Feed Table
18,000
Furnace Run-In Table
27,000
Two Furnace Discharge Tables
($7,000 each)
14,000
Billet Conveyor Table
10,000
Billet Up-ender and Billet Charging
Manipulator
25,000
Shell Handling Equipment
65,000
Set of Slugging and Piercing Tools
75,000
Set of Piercing Tools
70,000
Set of Hot Sizing Tools
80,000
Set of Cold Sizing Tools
75,000
Water Cooling and Lubrication
10,000
High Pressure Water Descaling
System
6,000
Foundation Bolt Plan and Eleva-
tions
4,000
Two Tool Slide Indices for Piercing
Presses ($18,000 each)
36,000
Two Bolster Plates for Piercing
Presses ($5,000 each)
10,000
Tool Slide Index for Hot Shell Siz-
ing Press
17,000
Handling Equipment at the Cold
Sizing Press
32,000
$595,000
Petitioner was engaged in the performance of this agreement during the years 1953, 1954, 1955 and 1956. Under the terms of the agreement, progress invoices covering 75 percent of 25 percent of work completed on any particular item were to be sent by petitioner to Macon *60 Arms until 75 percent of any particular item had been completed, after which 10 percent of the contract price for a particular item was to be invoiced at the time of shipment and the balance of 15 percent when it had been completed. The billings and cash receipts under the agreement for each of the years 1953 to 1956 were as follows: 1953
1954
1955
1956
Billings
$334,687.50
$260,312.50
Cash Receipts
334,687.50
210,218.75
$36,093.75
$14,000.00
On each of the original invoices, the following certification was made and signed: I certify the above bill is correct and just; that payment therefore has not been received; that all statutory requirements as to American production and labor standards and all conditions of purchase applicable to the transactions have been complied with and that State and local taxes are not included in the amounts billed. This is to certify that the statements made on this invoice are true and correct and are for materials and/or labor accomplished to date. We further understand that our books are subject to audit either by the U.S. Navy or MACON ARMS, Inc. representative at any time for verification of these figures. *61 Although petitioner billed and received in cash $334,687.50 for the year 1953, it only reported $238,033.68 as its gross receipts under the agreement for 1953. The balance of $96,653.82 was recorded in petitioner's books of account as a deferred credit. The gross receipts reported, $238,033.68, less reported costs of $168,617.04 resulted in a reported gross profit of $69,416.64 for 1953. The following is the method of computation utilized by petitioner to arrive at the gross profit of $69,416.64: Total contract price
$595,000.00
Less: 25% holdback
148,750.00
$446,250.00
Less: Cost of work com-
pleted to 12-31-53
$180,314.20
Estimated cost to
complete contract
140,540.16
320,854.36
Estimated profit less holdback
$125,395.64
$180,314.20 / $320,854.36 = 56.2%
56.2% X $125,395.64
$70,472.35
Less: Direct Expenses
1,055.72
Profit reported for year 1953
$ 69,416.63
The cost of work completed to December 31, 1953, and the estimated cost to complete the agreement were computed as follows: 1952
1953
1954
Mr. Berger's personal services
$ 2,750.00
$ 13,500.00
$ 15,600.00
Other services
10,002.88
39,976.77
35,500.00
Subcontractors
114,084.55
89,443.16
$12,752.88
$167,561.32
$140,543.16
12,752.88
Cost of work completed to 12-31-53
$180,314.20
Estimated cost to complete contract
$140,543.16
*62 The actual costs to petitioner under its agreement with Macon Arms for the years 1953 to 1956 are as follows: 1953
1954
1955
1956
$168,617.04
$204,609.70
$27,625.28
Petitioner reported the gross profit from the Macon Arms contract for the years 1953 to 1956 on its Federal income tax returns as follows: 1953
1954
1955
1956
Income
$334,687.50
$356,966.32 *
$50,093.75
$14,000.00
Costs +
168,617.04
204,609.70
27,625.38
Profits
$166,070.46
$152,356.62
$22,468.37
$14,000.00
Deferred
96,653.82
50,093.75
14,000.00
Reported on returns
$ 69,416.64
$102,262.87
$ 8,468.37
$14,000.00
*63 Petitioner's gross sales, net income or loss per return, the surplus or deficit in the surplus account, the salary paid to Berger and Berger's percentage of stock ownership in petitioner for the years 1946 to 1956 are as follows: Petitioner's
John N. Berger's
Percentage
Net Profit
of Stock
or (Loss)
Ownership
Year
Gross Sales
Per Return
Surplus (Deficit)
Salary
in Petitioner
1946
$153,829.17
$ 58.54
$ 34.45
$15,333.36
66 2/3%
1947
192,841.49
(63,178.64)
(63,144.19)
23,050.06
70.3%
1948
94,537.49
(6,551.66)
(65,918.92)
13,041.67
70.3%
1949
47,952.89
(3,017.81)
(69,783.87)
6,074.40
70.3%
1950
9,598.62
(4,936.56)
(74,720.43)
None
70.3%
1951
143,887.55
27,194.64
(51,173.76)
23,040.00
70.3%
1952
184,312.92
4,200.00
(48,136.01)
35,000.00
70.3%
1953
424,938.85
15,683.81
(37,157.34)
37,625.00 * *64 70.3%
1954
366,166.39
64,109.88
(884.60)
54,125.00 *
98%
1955
48,149.63
(77,561.72)
(78,479.32)
65,000.00 *
98%
1956
53,044.89
(2,835.50)
3,500.00
98%
A summary of Berger's salaries for the years 1949 to 1955 is as follows: 1949
1950
1951
1952
1953
1954
1955
Salary Paid
$ 6,074.40
None
$23,040
$35,000
$37,625
$54,125
$65,000
Paid in 1951 to apply on 1949
salary
4,000.00
(4,000)
Paid in 1952 to apply on 1949 and
1950 salaries
2,000.00
$ 9,000
(11,000)
Paid in 1953 to apply on 1950 and
1951 salaries
3,000
3,000
(6,000)
$12,074.40
$12,000
$22,040
$24,000
$31,625
$54,125
$65,000
Petitioner has paid no dividends for the years it has been in existence. The Commissioner determined that the gross receipts reported by petitioner from the Macon Arms contract in the amount of $238,033.68 for 1953 was understated by $96,653.82. Petitioner's taxable income for 1954 without consideration of any income from the Macon Arms agreement and without deduction for any part of Berger's salary is $29,698.79. Petitioner claimed an amount of $54,125 for Berger's salary of which $19,125 is in dispute. Petitioner is entitled to a net operating loss carry-back from 1955 in the amount of $23,344.94, plus or minus the *65 net income or loss from the Macon Arms contract and plus any amount allowed for Berger's salary. Petitioner claimed an amount of $65,000 as Berger's salary, of which $30,000 is in dispute. Reasonable compensation for Berger's services is $40,000 for each of the years 1954 and 1955. Opinion Petitioner entered into an agreement with Houdaille-Hershey Corporation, Macon Arms Division, for tools and equipment to produce automatically 8-inch shell forgings. The total compensation to be received under the agreement was $595,000. In 1953, petitioner billed and received in cash $334,687.50. However, petitioner on its return for 1953, only included $238,033.68 as gross income. It recorded the balance of $96,653.82 on its books as a deferred credit. The Commissioner determined that petitioner had understated its income for 1953 in the amount of $96,653.82. Accounting methods and periods are dealt with in sections 41 and 42, Internal Revenue Code of 1939. [1] And petitioner contends that it employed the long-term contract, percentage of completion method in reporting the gross income from the Macon *66 Arms contract for 1953. *67 The percentage of completion method for reporting gross income is authorized by the regulations set out in the margin. [2] As stated in the regulations, this method is not mandatory in so far as long-term contracts are concerned, but "may" be utilized if the taxpayer so elects. G.C.M. 22682, 1941-1 C.B. 307. The object of the percentage of completion method is to provide a means of reporting income in a steady flow as work on the contract advances toward completion. The procedure generally emploved to ascertain the percentage of completion is to divide the actual cost to date by the aggregate of the actual cost to date plus the estimated cost to complete the contract. However, the use of this formula poses the sometimes difficult problem of computing estimated cost, especially in the first year of the contract. *68 Turning to petitioner's computations as shown in the findings of fact, they indicate that petitioner ascertained a 56.2 percentage of completion for 1953 under the procedure described above, i.e., by dividing its cost of work completed for 1953 by the total of its cost of work completed plus the cost it estimated to complete the contract. Petitioner applied this percentage of completion to an amount designated as "estimated profit less holdback" which was computed by taking the contract price and deducting therefrom a 25 percent holdback and the costs. From the product of this multiplication it deducted direct expenses and arrived at a "profit reported for the year 1953." The Commissioner challenges petitioner's method of computation, charging that it is erroneous, in that petitioner applied the percentage of completion for 1953 to "estimated profit less holdback" rather than solely to gross income as required by the regulations. In Rosa Orino, 34 B.T.A. 726, 730 (1936), the taxpayer, in reporting the receipts of a Government contract on the percentage of completion method, included as income received under the contract not only the cash received but also the percentage *69 retained by the Government. In the course of our opinion holding that it was a proper method of reflecting income, we said that under the percentage of completion method "of returning income the full percentage is to be returned in any particular year even though actual payment of a balance due is not made until a later year." It follows from what we said in Orino that petitioner's method of accounting for gross income does not conform to the method prescribed by the regulations for reporting gross income on a long-term contract percentage of completion method. Even though petitioner's method of accounting is not in accord with the regulations for reporting gross income on a percentage of completion method, we still must consider whether the method employed by petitioner "clearly reflected income" within the purview of section 41. See Hegeman-Harris Co. v. United States, 23 F. Supp. 450 (Ct. Cl. 1938); Maloney v. Hammond, 176 F. 2d 780 (C.A. 9, 1949). Petitioner in defense of its deferral of $96,653.82 in 1953 maintains that it was necessary to reflect properly *70 its income, as the amount deferred represented prepaid income and unless it performed the services or delivered the goods for which the amounts were received petitioner would have had to make repayments. Arguing further on this tack, petitioner asserts that for this reason it has consistently followed the practice of deferring such receipts and taking them up ratably during the period in which they were earned. As support for its position, petitioner relies on Bressner Radio, Inc. v. Commissioner, 267 F. 2d 520 (C.A. 2, 1959) and distinguishes the Supreme Court's decision in Automobile Club of Michigan v. Commissioner, 353 U.S. 180 (1957). "An accounting method, though consistently used by the taxpayer, is not conclusive, and if the method does not clearly reflect income, computation is to be made upon a basis which in the Commissioner's opinion will do so." W. F. Trimble & Sons Co., 1 T.C. 482, 489 (1943). In Charles F. Dally, 20 T.C. 894 (1953) affd. 227 F. 2d 724 (C.A. 9, 1955), this Court had occasion to consider a *71 situation where the taxpayer on an accrual basis entered into a contract with the Government, under the terms of which payments were to be made upon the submission of properly certified invoices or vouchers semi-monthly. In Dally we expressed the view that: It is obvious from the facts that the certified figures contained in the estimates were to be the basis for determining the amounts which the petitioner was entitled to be paid and which he was in fact paid. No controversy existed between the petitioner and the Government over the petitioner's right to the payments in question, and the only reason the question is now raised is that the petitioner himself raises it in the hope of gaining a tax advantage. While the contract was in the course of performance neither party contemplated any course other than that payments were to be figured and paid on the basis of the estimates. As we see it, the petitioner's right to be paid ripened and became absolute upon the submission of the certified periodical estimates. * * * Accord Capital Engineering Co., 25 T.C. 1283 (1956), a case "practically indistinguishable" from Dally. We are unable to distinguish the instant proceedings *72 from Dally and we believe the disposition of this case is controlled by our rationale in that case. Inasmuch as we base our decision here on Dally, we do not deem it necessary to discuss the impact of the recent decision of the Supreme Court in American Automobile Association v. United States, 367 U.S. 687 (1961), rehearing denied October 9, 1961, on Bressner Radio, and Automobile Club of Michigan. For such a discussion see Smith Motors, Inc. v. United States, - F. Supp. - (D.C. Vt. 1961). Accordingly, we hold that petitioner had an unrestricted right to the $334,687.50 which it received in 1953 under the Macon Arms contract and that it should have included the entire amount in its gross income for that year. The remaining question concerns the amount of the net operating loss deduction, if any, to which petitioner is entitled for 1953. The parties have stipulated that petitioner's taxable income for 1954 without consideration of any income from the Macon Arms agreement and without deduction of any part of Berger's salary is $29,698.79 and that petitioner is entitled to a net operating loss carry-back from 1955 in the amount of $23,344.94 without considering any *73 net income or loss from the Macon Arms contract and without any amount allowed for Berger's salary. In view of our holding on the first issue dealing with the reporting of income from the Macon Arms contract, the second question is brought down to whether the amounts of $54,125 and $65,000 paid by petitioner to Berger as salary in 1954 and 1955, respectively, were reasonable. [3] Petitioner contends that the amounts paid were reasonable and are deductible in full. Conversely, the Commissioner claims that petitioner is not entitled to deduct as reasonable compensation an amount in excess of $35,000 for 1954 and 1955. *74 The question of what constitutes reasonable compensation is primarily a question of fact to be decided in light of all the attendant facts and circumstances. Consolidated Apparel Co., 17 T.C. 1570 (1952) affd. 207 F. 2d 580 (C.A. 7, 1953). In making this factual determination in the case before us, we have considered our finding that the success of petitioner was directly attributable to the engineering knowledge, skill and ability of Berger in conjunction with the testimony at the hearing that Berger had devoted over 60 hours per week to his corporate duties. We have also taken into account Berger's control over petitioner, that petitioner has never paid a dividend and that Berger's salary was not only increased in 1954 but was substantially increased again in 1955 even though petitioner incurred a loss from operations in that year. And we conclude from the foregoing that a reasonable compensation to Berger for 1954 and 1955 should not exceed $40,000 in each year. Decision will be entered under Rule 50. Footnotes
*. Explained as follows: ↩
Actual Receipts
$210,218.75
Deferred from 1953
96,653.82
Deferred to 1955
50,093.75
$356,966.32
+. Broken down as follows after transfer of $9,341.37 from 1954 to 1955: ↩
1953
1954
1955
Total
Engineering: Payroll
$ 39,976.77
$ 37,594.05
$ 5,673.95
$ 83,244.77
J. N. Berger
13,500.00
31,112.00
16,875.00
61,487.00
Manufacturing Costs
115,140.27
126,562.28
14,417.80
256,120.35
$168,617.04
$195,268.33
$36,966.75
$400,852.12
*. Broken down as follows: 1953
1954
1955
Lake Erie Engineering Co. Charges to Direct Engineering Expenses, only.
+↩
$10,205
Houdaille-Hershey Corp. +
13,500
$31,112
$16,875
Other
13,920
23,013
48,125
$37,625
$54,125
$65,000
1. Sec. 41. General Rule. - The net income shall be computed upon the basis of the taxpayer's annual accounting period (fiscal year or calendar year, as the case may be) in accordance with the method of accounting regularly employed in keeping the books of such taxpayer; but if no such method of accounting has been so employed, or if the method employed does not clearly reflect the income, the computation shall be made in accordance with such method as in the opinion of the Commissioner does clearly reflect the income. If the taxpayer's annual accounting period is other than a fiscal year as defined in section 48 or if the taxpayer has no annual accounting period or does not keep books, the net income shall be computed on the basis of the calendar year. Sec. 42(a) General Rule. - The amount of all items of gross income shall be included in the gross income for the taxable year in which received by the taxpayer, unless, under methods of accounting permitted under section 41, any such amounts are to be properly accounted for as of a different period. In the case of the death of a taxpayer whose net income is computed upon the basis of the accrual method of accounting, amounts (except amounts includible in computing a partner's net income under section 182↩) accrued only by reason of the death of the taxpayer shall not be included in computing net income for the period in which falls the date of the taxpayer's death.
2. Regulations 118. § 39.42-4 Long-term contracts. (a) Income from long-term contracts is taxable for the period in which the income is determined, such determination depending upon the nature and terms of the particular contract. As used in this section, the term "long-term contracts" means building, installation, or construction contracts covering a period in excess of one year from the date of execution of the contract to the date on which the contract is finally completed and accepted. Persons whose income is derived in whole or in part from such contracts may, as to such income, prepare their returns upon either of the following bases: (1) Gross income derived from such contracts may be reported upon the basis of percentage of completion. In such case there should accompany the return certificates of architects or engineers showing the percentage of completion during the taxable year of the entire work to be performed under the contract. There should be deducted from such gross income all expenditures made during the taxable year on account of the contract, account being taken of the material and supplies on hand at the beginning and end of the taxable period for use in connection with the work under the contract but not yet so applied. (2) Gross income may be reported for the taxable year in which the contract is finally completed and accepted if the taxpayer elects as a consistent practice so to treat such income, provided such method clearly reflects the net income. If this method is adopted there should be deducted from gross income all expenditures during the life of the contract which are properly allocated thereto, taking into consideration any material and supplies charged to the work under the contract but remaining on hand at the time of completion.↩
3. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: (a) Expenses. - (1) Trade or Business Expenses. - (A) In General. - All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered; * * *↩